**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ali Yousif Ahmed Al-Nouri, | No. CV-22-00633-PHX-GMS |
| Petitioner, | **ORDER** |
| v. | |
| Antony Blinken, et al., | |
| Respondents. | |

Pending before the Court is the Report and Recommendation ("R&R") of Magistrate Judge Deborah M. Fine (Doc. 36) regarding Petitioner Ali Yousif Ahmed Al-Nouri's Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2241 ("Petition"). The R&R recommends that the Petition be denied. Petitioner filed objections to the R&R (Doc. 39), and the Government responded (Doc. 45).

The Court has considered Petitioner's objections and reviewed the R&R de novo. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). For the following reasons, the Court overrules Petitioner's objections, adopts the R&R, and denies the Petition.

## BACKGROUND

Petitioner filed a habeas Petition arising out of an Order Certifying Extradition, issued by Magistrate Judge Michael T. Morrissey in the District of Arizona. (Doc. 36 at 2). The record of those proceedings indicate that the Iraqi government seeks to extradite Petitioner for the charge of murder with a maximum penalty of death. (*Id.* at 2-3). The Iraqi government alleges Petitioner was involved in planning and executing the murders of

two Fallujah police officers in 2006. (*Id.* at 3). On January 30, 2020, the United States Marshals Service arrested Petitioner in Phoenix, Arizona. (*Id.* at 4). On April 1, 2022, the Extradition Court issued an order certifying Petitioner as extraditable under 18 U.S.C. § 3184. (*Id.* 12–13). On April 15, 2022, Petitioner filed this action, raising twelve grounds for habeas relief. (*Id.* at 14). On June 26, 2023, Magistrate Judge Deborah M. Fine provided this Court with her R&R (Doc. 36),[1] rejecting each of Petitioner's twelve grounds for habeas relief and recommending that this Court deny the Petition. On August 4, 2023, Petitioner filed objections to nine of the twelve grounds that Judge Fine rejected in the R&R. (Doc. 39). The Government responded to those objections on September 15, 2023. (Doc. 45).

## DISCUSSION

### I.  Legal Standard

If a party objects to the magistrate judge's R&R, the district court "shall make a de novo determination of those portions of the report." *United States v. Ramos*, 65 F.4th 427, 433 (9th Cir. 2023). "After conducting de novo review, the district court 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'" *Id.* (citing 28 U.S.C. § 636(b)(1)(C)). The district court has "no obligation to provide individualized analysis of each objection." *Id.* at 434. Moreover, the district court is "not required to conduct 'any review at all . . . of any issue that is not the subject of objection.'" *Carrillo-Lozano v. Stolc*, 669 F.Supp.2d 1074, 1076 (D. Ariz. 2009) (quoting *Thomas v. Arn*, 474 U.S. 140, 149 (1985)).

### II.  Analysis

#### a.  Claim One

Petitioner first objects on the grounds that the Extradition Court's denial of his second motion to continue the extradition hearing violated his Fifth Amendment due process rights by depriving Petitioner of an opportunity to investigate fully and thereby preventing his counsel from presenting an effective defense. (Doc. 39 at 3). This Court

---

[1] The R&R provides a more detailed explanation of the factual and procedural history. (Doc. 36 at 2-14).

1    finds, however, that the denial of Petitioner's second motion for a continuance did not

2    violate Petitioner's due process rights.

3          An extradition court's denial of a requested continuance is reviewed for abuse of

4    discretion. *See United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir. 1985). "The matter

5    of continuance is traditionally within the discretion of the trial judge." *Ungar v. Sarafite*,

6    376 U.S. 575, 589 (1964). "[E]ven if the party fails to offer evidence or is compelled to

7    defend without counsel," the trial courts' denial of a request for more time does not

8    necessarily violate due process. *Id.* "There are no mechanical tests for deciding when a

9    denial of a continuance is so arbitrary as to violate due process." *Id.* Rather, "[t]he answer

10    must be found in the circumstances present in every case, particularly in the reasons

11    presented to the trial judge at the time the request is denied." *Id.*

12          Here, the United States government submitted its complaint for extradition on

13    January 29, 2020. (Doc. 39 at 4). The Extradition Court initially set the extradition hearing

14    for January 21, 2021. (*Id.* at 5). Petitioner moved to delay the hearing for six months

15    because of difficulties with conducting an investigation related to the COVID-19 pandemic

16    and violence in Iraq. (*Id.* at 4-5). The Extradition Court granted the motion for a

17    continuance and reset the hearing for May 25, 2021, allowing Petitioner additional months

18    to conduct an investigation. (*Id.* at 5).

19          On April 14, 2021, Petitioner submitted a second motion to continue the extradition

20    hearing, again citing the COVID-19 pandemic and violence in Iraq as reasons for delay.

21    (*Id.*). The Extradition Court denied this motion on April 21, 2021, concluding that "the

22    interest the government has in fulfilling its treaty obligations with foreign states in a timely

23    manner, the likelihood that granting the continuance will afford [Petitioner] the relief

24    sought, and the previous continuances and extensions granted" weighed against a

25    continuance. (Doc. 36 at 22-23).

26      "[A]n extradition hearing is of the character of a preliminary hearing and is not to

27    be converted into a full-dress trial . . . the amount of preparation necessary to provide a fair

28    hearing must be considered accordingly." *David v. Att'y Gen. of U.S.*, 699 F.2d 411, 415-

1   16 (7th Cir. 1983) (citations omitted).  When the Extradition Court denied Petitioner's

2   second request for a continuance on April 21, 2021, the extradition proceedings had been

3   pending for over a year.  Additionally, the Extradition Court had already granted

4   Petitioner's first request for a continuance, allowing multiple additional months for

5   Petitioner to investigate.  In both motions for a continuance, Petitioner cited the same

6   reasons for delay regarding COVID-19 and violence in Iraq.  In light of the fact that the

7   matter had been pending for over a year and the Extradition Court had granted Petitioner a

8   continuance once already for the same reasons, the Extradition Court acted properly within

9   its discretion in denying Petitioner's second request for a continuance.  *See David*, 699

10  F.2d at 415 (holding that "denial of the continuance did not contravene [Petitioner's] due

11  process rights" where "extradition proceedings had been pending for well over a year and

12  had been continued once before at the request of [petitioner]").[2]

13          **b.  Claim Two**

14          Petitioner next objects on the grounds that the Extradition Court's denial of his

15  motions to compel discovery violated his Fifth Amendment due process rights by denying

16  Petitioner the ability to investigate the integrity of witnesses who made statements.  (Doc.

17  39 at 7-8).  In particular, Petitioner asserts that the Extradition Court's denial of the

18  following three discovery requests violated his due process rights: (1) evidence of benefits

19  or promises to witnesses in exchange for their statements, (2) statements by anyone else

20  pertaining to the complaint for extradition, and (3) information pertaining to the United

21  States' participation in the drafting of the complaint.  (Doc. 39 at 7).  Upon review of the

22  R&R, the Court agrees with the Magistrate Judge's conclusion that the denial of these

23  motions to compel discovery did not violate Petitioner's due process rights.

24          An extradition court's denial of a discovery request is reviewed for abuse of

---

[2] In any event, the Court has permitted a full investigation in Iraq pending its review of the Magistrate Judge's R&R.  Although Petitioner has found additional evidence, as set forth below, such evidence does not "explain away" or "obliterate" the government's showing of probable cause.  *See Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016).  Even with Petitioner's additional evidence, there remains competent evidence in the record that supports a finding of probable cause.  *See Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986).

discretion. *Emami v. U.S. Dist. Ct. for N. Dist. of Cal.*, 834 F.2d 1444, 1452 (9th Cir. 1987). "An extradition proceeding is not a trial . . . discovery in an international extradition hearing is limited and lies within the discretion of the magistrate." *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005); *see also Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) ("[I]n an extradition proceeding, discovery is not only discretionary with the court, it is narrow in scope."). "In exercising this discretion, a judge should consider that extradition proceedings are not to be converted into a dress rehearsal for trial and whether the resolution of the contested issue would be appreciably advanced by the requested discovery." *Emami*, 834 F.2d at 1452.

"The only purpose of the extradition hearing is for the magistrate judge to determine whether the crime is extraditable and whether there is probable cause to support the charge." *Prasoprat*, 421 F.3d at 1014. "Extradition courts do not weigh conflicting evidence in making their probable cause determinations." *Barapind v. Enomoto*, 400 F.3d 744, 750 (9th Cir. 2005) (internal quotations omitted). "Although the accused is not entitled to introduce evidence that goes to his defense, he may offer limited evidence to explain elements in the case against him." *Quinn*, 783 F.2d at n.41. But extradition courts do not consider "contradictory" evidence, which involves evidence "the credibility of which could not be assessed without a trial." *Santos*, 830 F.3d at 993. "In practice, this means an individual contesting extradition may not, for example, present . . . facts contradicting the government's proof." *Id.* Further, the individual contesting extradition "may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government." *Id.* (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)).

This Court finds that the Extradition Court acted within in its discretion in denying Petitioner's discovery requests because Petitioner sought evidence that was outside the scope of an extradition hearing. The Extradition Court properly concluded that "evidence of benefits or promises to witnesses in exchange for their statements" constitutes impeachment evidence, which is not admissible in an extradition hearing. (Doc. 39 at 7;

Doc. 36 at 37); *Santos*, 830 F.3d at 993.  Further, the Extradition Court properly exercised discretion in finding that Petitioner's request for "statements by anyone else pertaining to the complaint for extradition" and "information pertaining to the United States' participation in the drafting of the complaint" lacked any indication that that information would "undercut or obliterate probable cause," which is necessary for evidence to be admissible in an extradition hearing.  (Doc. 39 at 7; Doc. 36 at 38-39); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2nd Cir. 1973) (holding that the extradition court had properly excluded evidence that would not "explain away" or "obliterate" the government's evidence "but would pose only a conflict of credibility").  Thus, the Extradition Court did not abuse its discretion, and resultingly, did not violate Petitioner's due process rights in denying the discovery requests.

### c.  Claim Three

Petitioner next objects on the grounds that the Extradition Court violated his Fifth Amendment due process rights by granting the United States' motion to exclude portions of the opinion of Petitioner's expert witness, Professor Haider Ala Hamoudi, regarding the Iraqi criminal justice system.  (Doc. 39 at 9).  This Court finds that the exclusion of portions of the expert witness's opinion did not violate Petitioner's due process rights.

"The only purpose of the extradition hearing is for the magistrate judge to determine whether the crime is extraditable and whether there is probable cause to support the charge." *Prasoprat*, 421 F.3d at 1014.  Thus, evidence regarding the law or criminal justice system of another country "is not relevant to the magistrate judge's inquiry." *Id.*

The Ninth Circuit adheres to a "rule of non-inquiry—that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." *Prasoprat*, 421 F.3d at 1016 (citing *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003) (finding that "judges generally refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be

treated humanely")).

Since it is not the role of the extradition court to inquire into another country's criminal justice system, and such evidence would not be relevant in an extradition hearing in any event, the Extradition Court properly excluded the portions of Professor Hamoudi's opinion regarding the Iraqi criminal justice system.  *See Prasoprat*, 421 F.3d at 1014-15 (finding the magistrate judge properly excluded evidence about the use of the death penalty from the extradition hearing because "it would not be relevant to the magistrate judge's decision regarding whether to certify [petitioner] as extraditable"); *see also Emami*, 834 F.2d at 1452 (finding that the magistrate judge properly excluded evidence regarding German law from extradition hearing, because "considerations of international comity and competence make it advisable to avoid such questions").  Thus, the Extradition Court did not violate Petitioner's due process rights by excluding portions of Professor Hamoudi's expert opinion.

### d.  Claim Four

Petitioner next objects on the grounds that the Extradition Court violated his Fifth Amendment due process rights by barring him from cross-examining and impeaching the United States' expert witness, Professor Craig Whiteside, at the extradition hearing.  (Doc. 39 at 12-13).  Again, however, the prohibition on cross-examination and impeachment of the government's witness did not violate Petitioner's due process rights.

"An accused in an extradition hearing has no right to contradict the demanding country's proof or pose questions of credibility as in an ordinary trial." *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981).  Further, "there is no right to cross-examination in extradition proceedings." *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1407 (9th Cir. 1988) (holding "[petitioner] was not denied due process by the extradition court's refusal to allow him to cross-examine").  And a petitioner "may not impeach government witnesses." *Santos*, 830 F.3d at 993.

Since Petitioner had no right to cross-examine or impeach the government's witness at the extradition hearing, the Extradition Court did not violate his due process rights by

barring him from cross-examining and impeaching Professor Craig Whiteside.

### e.  Claim Five

Petitioner next objects on the grounds that the charges against him in Iraq are non-extraditable political offenses under Article III of the Extradition Treaty.  (Doc. 39 at 15).  Upon review of the R&R, however, the Court agrees with the Magistrate Judge's conclusion that the "Extradition Court did not abuse its discretion in its factual determinations."  (Doc. 36 at 55).  Those factual determinations include the determination that: (1) any alleged action Petitioner took related to the murders was on behalf of AQI; and, (2), that, even though there were domestic insurgencies in Iraq at the time,  AQI was not one of them but was rather an internationalist terrorist group dedicated to "destroying the Iraqi government from without as opposed to supporting a domestic political struggle from within."  (*Id.* at 54).  Both of these findings are essentially factual and thus are reviewed under the clearly erroneous standard.  *Quinn,* 783 F.2d at 791.  As for the Extradition Court's legal conclusion that the political offense doctrine "does not protect acts of international terrorism," *Quinn*, 783 F.2d 776 at 806, this Court, in exercising its *de novo* review, affirms the determination of the Extradition Court.  Further, because the "[Extradition Court's] probable cause finding . . . must be upheld if there is any competent evidence to support it," this Court accepts the R&R as to its resolution of claim five.  *Id*. at 791.

### f.  Claim Six

Petitioner next objects on the grounds that the United States did not establish probable cause that Petitioner committed the alleged offenses.  (Doc. 36 at 19).  But, it did.

The Extradition Complaint alleges that Petitioner was involved in the murders of Lieutenant Hussein and Officer Mohammad.  (Doc. 36 at 61).  "[U]nder Article 406/1/A of the Iraqi Penal Code, an individual [can] be guilty of premeditated killing as either a principal or accessory."  (*Id.*).  According to the Extradition Court, an accessory can include "an individual who conspires with others to commit an offense and that offense is committed on the basis of such conspiracy, whereas an individual could be considered a

1  principal if he is present during the commission of that offense or any act contributing to

2  that offense."  (Doc. 36 at 61) (internal quotations omitted).

3  Petitioner contends that the "Iraqi Al-Karhk Investigative Court's evidence fails to

4  establish probable cause that [he] committed the charged offenses."  (Doc. 39 at 19).

5  Specifically, Petitioner alleges that contradictory and flawed witness statements, along

6  with declarations submitted by One World Research (OWR),[3] provide a "starkly different

7  view of who shot the officers," when contrasted with the Iraqi-offered evidence.  (Doc. 39

8  at 20).  The Court reviews the evidence that the Magistrate Judge relied on, including the

9  OWR declarations added to the record after the Extradition Court decision, to make her

10  probable cause finding for each murder below.

### i. Legal Standard

12  Courts have interpreted extradition treaties "to require a showing of 'probable

13  cause' to believe that the person sought to be extradited committed the charged offense."

14  *Marquez v. Molinari*, No. 95-17056, 1996 WL 155158, at *2 (9th Cir. April 3, 1996).

15  Probable cause is a "fair probability" that the suspect committed the charged offense.

16  *Garcia v. County of Merced*, 639 F.3d 1206, 1208-09 (9th Cir. 2011).  "The magistrate's

17  probable cause determination 'serves only the narrow function of indicating those items of

18  submitted evidence on which the decision to certify extradition is based.'"  *Quinn*, 783

19  F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d at 1342 n.10).  In its review, the district

20  court "does not weigh conflicting evidence and make factual determinations but, rather,

21  determines only whether there is competent evidence to support the belief that the accused

22  has committed the charged offense." *Marquez*, 1996 WL 155158, *2 (quoting *Quinn*, 783

23  F.2d at 815).  The probable cause determination "must be upheld if there is any competent

24  evidence in the record to support it."  *Quinn*, 783 F.2d at 791.

25  The accused may admit evidence that "explains matters referred to by the witnesses

26  for the government," but "evidence in defense that merely contradicts the testimony for the

---

[3] OWR is an international investigative organization that produced evidence in October and December of 2022, after the Extradition Court's April 2022 Order Certifying Extradition was transmitted to the United States Department of State.  (Doc. 36 at 21).

1    prosecution may be excluded." *Santos*, 830 F.3d at 992 (internal quotations omitted).  To

2    determine whether evidence is "explanatory" or "contradictory," district courts rely on a

3    general principle: explanatory evidence "explains away or completely obliterates probable

4    cause,' whereas contradictory evidence "merely controverts the existence of probable

5    cause, or raises a defense." *Id.* (quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th

6    Cir. 1999)).  "In practice, this means that an individual contesting extradition may not, for

7    example, present alibi evidence, facts contradicting the government's proof, or evidence of

8    defenses like insanity, as this tends to call into question the credibility of the government's

9    offer of proof." *Id.* at 993.

10    **ii.  Murder of Lieutenant Hussein**

11    **1.  Evidentiary Basis of Probable Cause Determination**

12    The Magistrate Judge based her probable cause determination on statements from a

13    cooperator and an eyewitness.  The Cooperator stated in testimony on June 6, 2010, to the

14    Office of Counterterrorism, Al-Fallujah, that he worked with Petitioner in AQI, that

15    Petitioner was the Emir of the group, and that they and three others agreed to kill the

16    Lieutenant.  (Ex. Doc. 3-1 at 107 (unredacted)).[4]  The Cooperator also attested that they

17    met at Petitioner's carpentry store on Street 40 in Fallujah, Iraq, drove a white Prince car

18    for the operation, and had both AK47s and a 9mm handgun.  (*Id.*).  The Cooperator stated

19    that he watched the road while Petitioner stepped out and fired shots at the Lieutenant.

20    (*Id.*).  The Cooperator provided additional testimony for the "Al-Fallujah Investigative

21    Court."  (*Id.* at 110).  He again stated that while he was at Petitioner's shop on Street 40, a

22    group that included Petitioner agreed to kill the Lieutenant, Petitioner was the Emir of the

23    group, and they drove a white Prince with both automatic weapons and guns.  (*Id.*).  In this

24    second statement, the Cooperator testified that he did not participate in the operation, but

25

26

27    [4] The citations that include "Ex. Doc." in this Order refer to documents in the original
record, which the Magistrate Judge reviewed.  To view that record, the case number is
28    2:20-mj-08033-MTM.

- 10 -

that Petitioner told him "that he executed the operation using a 9mm handgun." (*Id.*).  On the same day as the interviews, the Cooperator participated in a "[w]alk through hearing for the accused who confessed," during which he was able to walk to Street 40 and reiterate much of what he had previously testified to, including that he was present when the agreement to kill the Lieutenant took place, they were at Petitioner's shop, they used a white Prince car, they had automatic weapons and pistols, and Petitioner killed the Lieutenant.  (*Id.* at 85-86).

Eyewitness One testified on November 1, 2009 to the Investigative Court, Fallujah. (*Id.* at 106).  The witness stated that on the date of the incident he was sitting at a store on Street 40 with the Lieutenant, a black car with white stripes approached, six people exited the car, one person threatened to shoot the witness, and another attempted to fire at the Lieutenant but had a broken gun.  (*Id.*).  The witness also testified that Petitioner, unmasked and armed, tried to stop the murder, at which point one of the masked individuals told Petitioner to "step back" and then shot the Lieutenant.  (*Id.*).  On the same day, in testimony to the Office of Counterterrorism, the witness testified that Petitioner was the Emir of the group that killed the Lieutenant and entered the store to stop the murder, but only after the Lieutenant had already been killed.  (*Id.* at 105).  The witness also stated that "there is a confession disk about all the accomplices among them the criminal [Petitioner]."  (*Id.*).

Petitioner submitted OWR-produced declarations from three witnesses, which the Magistrate Judge reviewed before making her probable cause determination.  Each of the three witnesses stated that Petitioner was there that day and at his shop when the killing occurred.  (Doc. 33-1 at 3, 5-6, 8).  All three witnesses also stated that Petitioner was not involved in the shooting.  (*Id.*).

## 2.  Petitioner's Contentions

Petitioner asserts that inconsistencies in eyewitness statements, taken in conjunction with the declarations submitted by OWR of three witnesses, make it "impossible to conclude that sufficient evidence of probable cause exists" to support an allegation that Petitioner murdered Lieutenant Hussein or was associated with whomever did kill the

1    policeman.  (Doc. 39 at 21, 23).  First, Petitioner argues that Eyewitness One's statement
2    that Petitioner tried to stop the murder of the Lieutenant undermines probable cause
3    "because it is an implicit recantation of a previously stated inculpatory accusation that
4    [Petitioner] murdered the lieutenant."  (Doc. 39 at 22).  Petitioner points to the witness's
5    testimony detailing what happened, including that masked men, who were not Petitioner,
6    ultimately shot the Lieutenant.  (Doc. 39 at 22-23).  Petitioner also notes that, while the
7    witness stated there was a confession disk that included the Petitioner, the disk was never
8    produced, which could suggest the disk never "existed in the first place."  (Doc. 39 at 23).
9    This evidence, Petitioner asserts, considering the statements produced by OWR in which
10   three witnesses state that Petitioner was not involved in the shooting, "are not mere
11   inconsistencies having to do with minor details."  (Doc. 39 at 23).

### 3.  Probable Cause Determination

13        The record contains "competent evidence [to] support[] probable cause for the
14   offenses in the Extradition Complaint."  (Doc. 36 at 74); *see Quinn*, 783 F.2d at 791 (the
15   probable cause determination "must be upheld if there is any competent evidence in the
16   record to support it").  Both the Cooperator and Eyewitness One stated that the murder
17   took place on Street 40, Petitioner was present at the scene, Petitioner had a gun, and
18   Petitioner was the Emir of the group.  (Ex. Doc. 3-1 at 105, 107 (unredacted)).  This
19   testimony is competent evidence to support a finding of probable cause that Petitioner
20   participated in the murder of the Lieutenant.

21        There are certain inconsistencies in the testimony, including the car color and
22   Petitioner's exact role on that day, and the disk referenced by Eyewitness One was not
23   produced.  The Petitioner also provided OWR-produced declarations that state Petitioner
24   was not involved in the murder.  However, these inconsistencies do not undermine the
25   competent evidence that supports a finding of probable cause that Petitioner murdered, or
26   was associated with those who did murder, the Lieutenant.  Nor does the Court find the
27   OWR-produced declarations "explain[] away or completely obliterate[] probable cause."
28   *See Santos*, 830 F.3d at 992.  Instead, the statements contradict the evidence provided by

the Iraqi Court, and this Court may not consider "contradictory evidence" that "tends to call into question the credibility of the government's offer of proof." *See id*. at 993.

Thus, the Court finds no basis for overturning the Extradition Court and Magistrate Judge's findings of probable cause, with respect to the murder of Lieutenant Hussein.

### iii.   Murder of Officer Mohammad

#### 1.   Evidentiary Basis of Probable Cause Determination

The Magistrate Judge based her probable cause finding on statements from two eyewitnesses and a cooperator. The first witness, Eyewitness Three, stated during a 2019 interview that he was present at Street 40 and saw a red Opel car appear with four people inside. (Ex. Doc. 3-1 at 76 (unredacted)). The witness testified that the people in the car open fired on the Officer. (*Id*.). As the car withdrew from the area, the witness recognized Petitioner because they lived near each other, Petitioner "was well known in the area for conducting assassination operations on most members of the Police force," and Petitioner worked as a carpenter in his own store on Street 40. (*Id*.). The Witness also identified Petitioner in a group of photos. (*Id*.). The second witness, Eyewitness Two, stated during a 2019 interview that he was standing near the location where the incident took place and that, among those who fired shots, he recognized Petitioner as Petitioner's mask fell off. (*Id*. at 75).

The Cooperator provided statements to the Office of Important Crimes and to the Office of Counter Terrorism in 2006. (Ex. Doc. 3-3 at 78-79, 8-82 (redacted)). In his statement to the Office of Important Crimes, the Cooperator stated that he joined a group that was "working on killing police members" and that Petitioner was the leader of the group. (*Id*. at 78). In his testimony, the Cooperator stated that the group agreed to kill the Officer and went out to monitor him. (*Id*.). Cooperator further testified that Petitioner told the group that the Officer was present near the stores on Street 40, and Petitioner provided protection to the car the Cooperator was in, which is the car that executed the job. (*Id*.). Petitioner stated that "shots were fired at [Officer] dropping him dead," and that Petitioner took the dead Officer's handgun. (*Id*.). In the Cooperator's statement to the Office of

Counterterrorism in 2010, he again testified that the same group that killed Lieutenant Hussein agreed to kill Officer Mohammad. (Ex. Doc. 3-1 at 107 (unredacted)). He testified that the group left in two cars: the first car was a walnut-colored Opel with Petitioner and others carrying AK47s and 9 mm handguns and the other car was a grey Opel with Cooperator and others carrying AK47s. (*Id*.). According to the Cooperator, when they saw Officer Mohammad standing near stores on Street 40, the car with Petitioner stopped, Petitioner and another individual got out and shot Officer Mohammad with AK47s, and then they all fled. (*Id*. at 108). The Cooperator testified that he shot rounds above people's heads to disburse and frighten them, so the group could finish the operation. (*Id*.).

The OWR produced a declaration relating to Officer Mohammad's murder; however, the Magistrate Judge decided not to consider the declaration because the "declaration invites credibility determinations between the unsworn statements in the declaration and sworn statements of Eyewitness Two submitted in support of the extradition request," which would require a "mini trial … [and] is the type of evidence and these are the credibility and other considerations prohibited in extradition proceedings." (Doc. 36 at 74); *see Barapind*, 400 F.3d at 749-50 (challenges to credibility exceeds the limited mandate of extradition courts in making their probable cause determinations). The Court agrees with the Magistrate Judge and excludes the declaration from consideration for this probable cause determination.

## 2. Petitioner's Contentions

Petitioner argues that the Magistrate Judge erred in finding probable cause because of issues with the evidence. First, Petitioner notes that the Cooperator referred to Petitioner by "Ali Yousif Al-Mahmadi," which is a name no other witness or piece of evidence uses to refer to Petitioner. (Doc. 39 at 25). Petitioner also points to inconsistencies in Cooperator's testimony, specifically that he did not state that Petitioner shot Officer Mohammad in his 2006 statement to the Office of Important Crimes (Ex. Doc. 3-3 at 78-79) but, in his 2010 statement, he did state that Petitioner got out of the car and shot the Officer (Ex. Doc. 3-1 at 108). Further, Petitioner incorrectly states that at the end of the

2010 statement, the Cooperator testified, "this is my statement without being coerced," which should cast doubt on the statement.  (Doc. 39 at 25; Doc. 3-3 at 80).  Finally, Petitioner objects to the statement of Eyewitness Two because his testimony occurred in 2019, which was twelve years after the event.  (Doc. 39 at 26).  Petitioner also objects to the statement of Eyewitness Two because the fourth OWR-produced declaration stated that he was not at the scene of the shooting and did not see anything.  (*Id.* at 26-27).

### 3.  Probable Cause Determination

The Court accepts that "competent evidence supports the . . . finding of probable cause that Petitioner participated in the murder of Officer Mohammad."  (Doc. 36 at 72); *see also Quinn*, 783 F.2d at 791 (stating that the determination of probable cause "must be upheld if there is any competent evidence in the record to support it.").  At a minimum, the pieces of evidence provided by Iraq consistently identify that Street 40 in Fallujah was the location of the murder, Petitioner was present at the scene of the murder, Petitioner carried a gun while other participants carried AK47s, and the group drove two cars to commit the murder.  As was the case for Lieutenant Hussein, this is sufficient evidence to find probable cause that Petitioner participated in the murder of the Officer.

Petitioner's assertion that Cooperator lacks credibility due to calling Petitioner by "Ali Yousif Al-Mahmadi," a name not referenced elsewhere in the record, is not compelling.  First, the case summary provided by Judge Jabbar Husaain 'Alyawi, the investigative judge assigned to Petitioner's case, states that Petitioner is known by over five other names.  (Ex. Doc. 3-3 at 31 (unsealed)) ("[Petitioner] uses many names among which are Ali Ahmed, Ali Yousif Ahmed Al-Nouri, Ali Yousif Ahmed Nouri, Ali Al-Daleme, Ali Yousif Ahmed Al-Mahmadi and currently he uses the name Ali Yousif Ahmed.") (internal parenthesis omitted).  Second, other details in the Cooperator's testimony affirm Petitioner's identity, such as identifying Petitioner as the owner of a carpentry store on Street 40 in Fallujah—a fact confirmed by Iraqi National Security Services.  (Ex. Doc. 3-1 at 31).  Finally, given the consistency of facts between the Cooperator's account and the accounts of Eyewitnesses Two and Three, the Cooperator's

1 reference to "Ali Yousif Al-Mahmadi" does not undermine a finding of probable cause.

2       There are inconsistencies between the Cooperator's 2006 and 2010 statements.
3 However, regardless of who exactly fired the guns at the time of the murder, the facts
4 establish that Petitioner was present, Petitioner had a gun, Petitioner participated in the
5 planning of the murder, and Petitioner participated in the murder itself. These facts are
6 sufficient to support a finding of probable cause. Further, in the context of an extradition
7 proceeding, "next to the confession of the defendant, [a cooperator's statement] is the most
8 satisfactory kind of evidence that can be produced as to the guilt of the defendant." *Curreri*
9 *v. Vice*, 77 F.2d 130, 132 (9th Cir. 1935); *see also Zanazanian v. U.S.*, 729 F.2d 624, 627
10 (9th Cir. 1984) ("This circuit has held that the self-incriminating statements of accomplices
11 are sufficient to establish probable cause in an extradition hearing."). The Cooperator's
12 testimony, both in 2006 and 2010, implicates himself as a member of the group that
13 murdered Officer Mohammad, rendering him an accomplice and his testimony persuasive
14 in finding probable cause.

15       Finally, the fact that Eyewitness Two's testimony occurred in 2019 does not
16 undermine a finding of probable cause. Petitioner has provided no other fact, aside from
17 the time delay, to cast doubt on Eyewitness Two's testimony. (Doc. 39 at 26). The mere
18 notion that Eyewitness Two's testimony occurred twelve years after the event does not
19 undermine the fact that there is "competent evidence in the record" to support a finding of
20 probable cause. *See Quinn*, 783 F.2d at 791 (the probable cause determination "must be
21 upheld if there is any competent evidence in the record to support it"). Further, the OWR-
22 produced declaration constitutes contradictory evidence, which this Court may not
23 consider, since it challenges the credibility of Eyewitness Two. *See Santos*, 830 F.3d at
24 992.

25       For the reasons above, the Court finds no basis for overturning the Extradition Court
26 and Magistrate Judge's findings of probable cause, with respect to the murder of Officer
27 Mohammad.

      **g. Claim Seven**

28       Petitioner next objects on the grounds that Petitioner has not been "charged" with a

treaty-enumerated crime as required by Articles I and II of the U.S.-Iraq extradition Treaty. (Doc. 39 at 29).   Nevertheless, the Petitioner was properly charged under the Treaty's requirements.

### i.  The Treaty Does Not Require Formal Charges

Although a district court has a limited scope of review of a magistrate judge's extradition order, it may review "whether the offense charged is within the treaty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).  Whether the offense charged is within the treaty "ordinarily involves a determination of whether it is listed as an extraditable crime and whether the conduct is illegal in both countries; these are purely legal question." *Quinn*, 783 F.2d at 791.  "[T]he habeas court may review [purely legal questions] de novo." *Id*.  Here, at issue is the meaning of the word "charged" within the Treaty.  This is a "purely legal question," which the Court will consequently review de novo.  *See U.S. ex re. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 ("The interpretation of a treaty is a question of law and not a matter of fact."); *see also Manriue v. O'Keefe*, No. 21-cv-08395, 2022 WL 1212018, *6-7 (N.D. Cal. April 22, 2022) ("The petitioner's challenges to the applicability of the Treaty (based on the meaning of 'charged' and 'the charging document') are legal questions . . . subject to de novo review.").

Interpreting the Treaty to require formal charges is not consistent with the Treaty's text or Ninth Circuit precedent.  Article I of the Extradition Treaty provides for extradition of "any person charged with or convicted of any of the crimes specified in Article II of this Treaty."  (Ex. Doc. 3-3 at 8).  The Treaty further provides that "such surrender shall take place only . . . (a) When the person whose surrender is requested is charged with a crime." (*Id*.).  Article II states that a person may be extradited if he has been "charged with or convicted of" any of the specified offenses.  (*Id*. at 9).

The court's interpretation of a treaty begins with the text.  *Medellin v. Texas*, 552 U.S. 491, 507 (2008).  Where a treaty can be constructed as restrictive of rights or as enlarging rights, "the more liberal construction is to be preferred."  *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933).  Based on these rules of interpretation, the Court reads the Treaty as enlarging the rights of the United States and Iraq to extradite

people charged with a crime, without any requirement that formal charges be filed against the individual. *See Manrique v. Kolc*, 65 F.4th 1037, 1043 (9th Cir. 2023) (holding that "our rules of interpretation militate against reading in a requirement of particular formal charges where the treaty makes no such specification"); *see also Emami*, 834 F.2d at 1448 (9th Cir. 1987) (applying the 7th Circuit's interpretation that "charged" imposes "no requirement that formal charges be filed"). Accordingly, Petitioner has been "charged" within the meaning of the Treaty.

### ii.  Iraq Intends to Prosecute Petitioner

Petitioner concedes that "case authority has interpreted charge to encompass an 'accusation' without the accompaniment of a formal document'; however, Petitioner asserts that Iraq has incorrectly interpreted "charge" to mean "more broadly the act of 'investigation.'" (Doc. 39 at 30). Petitioner objects to his extradition on the grounds that Iraq wants the United States to extradite him for the purposes of investigation without charging him, as required by the Treaty. As evidence of this, Petitioner points to the Case Summary that is the basis for the extradition. (Doc. 39 at 30). He asserts that the Judge "states that he is the 'investigative judge'" and that his "investigation is ongoing in the murder case[s]' of Lieutenant Hussein and Officer Mohammad by Ali Yousif Ahmed Al-Nouri." (*Id.*).

The Case Summary that Petitioner points to explicitly states that, "[b]ased on the conducted investigations, the available evidence indicates that the crimes were committed by [Petitioner] and his group of Al-Qaeda organization in Iraq." (Ex. Doc. 3-3 at 19). The Summary states that Petitioner is a "wanted person." (*Id.*). Taken in conjunction with the "Arrest and Investigation Warrant," which states law enforcement officers are "empowered and tasked to arrest" Petitioner because he is "accused of" offending "article (406/1/A) of the Iraqi Penal Code," the Court finds no reason to believe Iraq understands "charge" to mean anything other than accuse. Further, Iraq's statements of intention to charge are sufficient to satisfy the requirements of the Treaty. *See Emami*, 834 F.2d at 1449 (holding that, where the U.S.-Germany extradition treaty specified that extradition may be granted "for prosecution," "statements of intention on the part of the German government" were

sufficient under the treaty).

### iii.   No Evidence Iraq Intends to Circumvent Articles II and VI

Finally, Petitioner objects to his extradition by asserting that, if he is extradited, "he may be subjected to an investigation for crimes other than the murders of the two policemen."   (Doc. 39 at 30-31).   This, Petitioner asserts, would result in Iraq circumventing Article II and making Article IV unenforceable. (*Id*.).   As discussed above, Article II of the Treaty provides for extradition of "any person charged with or convicted of any of the crimes specified in Article II of this Treaty."   (Ex. Doc. 3-3 at 8).   Article IV of the Treaty states that "[n]o person surrendered shall be tried for any crime other than that for which he was surrendered without the consent of the surrendering" party. (*Id*. at 11).   This assertion is both speculative and unrelated to Petitioner's objection that Petitioner has not been "charged" with a treaty-enumerated crime.   As established above, Iraq complied with the Treaty by charging Petitioner with crimes specified in Article II.   Upon extradition, Iraq may prosecute him for those crimes and none other, unless the United States consents to prosecution for additional crimes under Article IV.   The Court thus finds that Petitioner was properly charged under the Treaty.

### h.  Claims Eight and Eleven

Petitioner next objects on the grounds that extradition should not be certified because Petitioner may face abusive and arbitrary procedures in the Iraqi criminal justice system and because punishment for murder may violate Iraqi constitutional principles. (Doc. 39 at 31-32).   Neither Petitioner's potential treatment in the Iraqi penal system, nor the fact that punishment may violate Iraqi constitutional principles, bars extradition in this case.

In deciding whether to certify extradition, courts do not consider the potential treatment of the accused in an international penal system or whether punishment would violate the constitutional principles of another country.   *Blaxland*, 323 F.3d at 1208 (finding that "judges generally refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely

- 19 -

to be treated humanely").  The Ninth Circuit has long adhered to a "rule of non-inquiry—that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state."  *Prasoprat*, 421 F.3d at 1016.

Although Petitioner argues that this Court should make an exception to the rule of non-inquiry, there is no basis for the Court to do so.  *See Mainero*, 164 F.3d at 1202 (holding that "there is no basis for applying a humanitarian exception to extradition"); *see also Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983) (finding that a humanitarian exception "has yet to be employed in an extradition case").  Thus, in certifying extradition, this Court does not consider Petitioner's potential treatment in the Iraqi penal system or the fact that Petitioner's punishment may violate Iraqi constitutional principles.  Those matters are not relevant to the Court's decision to extradite Petitioner in this case.

**IT IS THEREFORE ORDERED** accepting the Report and Recommendation of Magistrate Judge Fine (Doc. 36).

**IT IS FURTHER ORDERED** that Respondents United States Attorney General and the United States Secretary of State be dismissed.

**IT IS FURTHER ORDERED** that Van Bayless, the Acting United States Marshal for the District of Arizona, be substituted in place of currently named and now retired United States Marshal David Gonzales.

**IT IS FURTHER ORDERED** that Petitioner Ali Yousif Ahmed Al-Nouri's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to terminate this matter.

Dated this 7th day of October, 2024.

G. Murray Snow

G. Murray Snow
Chief United States District Judge

- 20 -